IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>JOHN ELISHA MAYVILLE,<br><br>　　　　　　Defendant. | Case No. 2:16-CR-266 JNP<br><br>**MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>District Judge Jill N. Parrish |

Defendant John Elisha Mayville filed a motion to suppress. Following an evidentiary hearing, the parties briefed the legal issues raised by the motion. Mr. Mayville argues that the traffic stop conducted by the Utah Highway Patrol troopers was unreasonably prolonged, thereby resulting in a Fourth Amendment violation and a warrantless search. Based on the evidence and case law relating to these issues, the court hereby DENIES Mr. Mayville's motion to suppress. [Docket 40]

## I. FINDINGS OF FACT

1. On May 6, 2016, Trooper Jason Tripodi stopped a red Audi for speeding on I-70. It was going 71 miles per hour in a 60-miles-per-hour zone.[1]

2. Trooper Tripodi approached the vehicle, made contact with Mr. Mayville, and spoke to him about his speeding.[2] Mr. Mayville stated that he was travelling to Grand Junction, Colorado, from Lake Havasu, Arizona.[3]

3. Trooper Tripodi's initial contact with Mr. Mayville lasted a couple of minutes.[4] During this initial contact, Trooper Tripodi asked for Mr. Mayville's license, registration, and proof of insurance.[5] While Mr. Mayville searched for these documents, Trooper Tripodi observed that he "had a lot of trouble coming up with that requested paperwork."[6] Trooper Tripodi noted that the length of time he spent at the passenger side window was due to Mr. Mayville searching for the paperwork.[7] Trooper Tripodi observed that Mr. Mayville seemed like he "was drowsy, or something was wrong, something was up."[8] Mr. Mayville "seemed confused almost" and Trooper Tripodi noticed that Mr. Mayville "wasn't able to multitask like a

---

[1] Tr. at 7:25-8:25. Additionally, references are made to UHP Trooper Tripodi's dash cam video, entered into evidence as Exhibit 1. It will be referred to as "Video, at ___." The times listed are approximations.
[2] Tr. at 10:16-23; Video, at 1:46:45-1:47:14.
[3] Tr. at 10:24-11:5; Video, at 1:46:54-1:47:35.
[4] Tr. at 11:6-8.
[5] *Id*. at 11:9-15.
[6] *Id*.
[7] *Id*.; *Id*. at 27:23-28:12.
[8] *Id*. at 11:16-18.

normal individual would be able to."[9]  Trooper Tripodi asked Mr. Mayville on multiple occasions if he was okay, based on his interaction with him.[10]

4. Trooper Tripodi became concerned that Mr. Mayville may be impaired or drowsy.[11]

5. Trooper Tripodi asked Mr. Mayville if he would mind coming back to his vehicle to talk to him while he filled out his paperwork.[12]  Mr. Mayville declined this invitation.

6. Trooper Tripodi returned to his vehicle and began filling out the paperwork for the stop.[13]  He also radioed dispatch in order to run a records check on Mr. Mayville. Trooper Tripodi requested that dispatch run Mr. Mayville's license and check for warrants.[14]  Trooper Tripodi conducted this check through dispatch because the UHP computers in patrol cars cannot conduct a complete warrant check.[15]

7. About a minute later, Trooper Tripodi radioed for a Narcotic Detector Dog (NDD) and handler.[16]

---

[9] *Id*. at 11:18-12:1.
[10] Tr. at 13:7-12; 27:19-22; 28:13-18; Video, at 1:47:50 (first time); 1:49:26-35 (second time); 1:49:35-40 (Mr. Mayville's response about being tired); 1:52:12 (third time); 1:52:15-55 (Trooper Tripodi remarking that Mr. Mayville seemed really out of it).
[11] Tr. at 12:16-25.  Intoxicated driving, or drowsy driving, are both concerns for UHP and the motoring public in general, as testified to by Trooper Tripodi.  *Id*. at 13:1-6.
[12] Tr. at 13:13-18; Video, at 1:50:40.
[13] Tr. at 13:19-22; 14:13-18; 28:19-24.
[14] *Id*. at 13:22-14:12; 28:25-29:5; 41:24-42:19; Video, at 1:53:25-1:54:00.
[15] Tr. at 14:3-12.
[16] *Id*. at 14:19-15:6; 26:11-23; 29:22-30:2; Video, at 1:55:16-44.

8. After radioing dispatch for records and for a NDD, Trooper Tripodi continued filling out a citation for Mr. Mayville, including "attempting to figure out whose vehicle it was because [Mr. Mayville] had no registration paperwork."[17]

9. Approximately four minutes later, prior to dispatch returning any records check information on either Mr. Mayville or the vehicle, Trooper Mackleprang arrived with his NDD.[18]

10. Once Trooper Mackleprang arrived, Trooper Tripodi briefly informed him about what had occurred.[19] Trooper Mackleprong then walked up to Mr. Mayville's car and asked him to exit the vehicle so that he could run his NDD around the car. Mr. Mayville refused.[20] Trooper Mackleprang observed that Mr. Mayville had delayed reactions, "almost like a blank stare," which caused him to suspect that Mr. Mayville was impaired.[21]

11. Trooper Macklprang requested Trooper Tripodi's assistance.[22] The two troopers convinced Mr. Mayville to exit the vehicle, and Trooper Tripodi patted Mr. Mayville down to check for weapons. Trooper Tripodi instructed

---

[17] Tr. at 30:13-31:6. Trooper Tripodi attempted to ascertain this information by running either the plate or the VIN through his computer. *Id*.
[18] Tr. at 15:7-11; 57:18-58:18; Video, at 1:59:54. NDD Hasso is a trained dog who can detect the odors of marijuana, methamphetamine, heroin and cocaine. Tr. at 48:20-49:17. He has undergone extensive certification and trainings, including bi-weekly current trainings. *Id*.
[19] Tr. at 15:15-19; 31:9-15; 50:4-11; 58:19-59:6; Video, at 2:00:20-30.
[20] Tr. at 15:18-23; 31:19-22; 50:4-51:11; Video, at 2:00:35-02:35.
[21] Tr. at 66:21-68:10.
[22] Tr. at 15:25-16:8; 51:12-22; Video, at 2:02:40-03:15. Records checks had not yet returned from dispatch. Tr. at 16:9-11.

Mr. Mayville to stand on the side of the road a few feet in front of the vehicle.[23]

12. The NDD sniffed around the vehicle and alerted to the presence of narcotics.[24]

13. After the NDD had alerted to the presence of narcotics in the vehicle, dispatch returned the information about Mr. Mayville and his vehicle, indicating that Mr. Mayville had a criminal record.[25]

14. Trooper Mackleprang explained to Mr. Mayville that his NDD had indicated to the odor of narcotics, at which point Mr. Mayville stated, "there's no way, there's no way."[26] The troopers explained that they were going to search the vehicle and moved Mr. Mayville to Trooper Tripodi's vehicle.[27]

15. The troopers conducted a search and found two handguns and a homemade suppressor inside the engine area (one wrapped in a cloth bag, another vacuum sealed with the suppressor); a yellow plastic container with three packages of methamphetamine, totaling approximately one pound (453 grams) behind the carpeted wall of the trunk on the passenger side; and

---

[23] Tr. at 16:18-17:7.
[24] Tr. at 31:23-32:3; 51:19-54:24; Video, at 2:04.
[25] Tr. at 22:8-24; 32:4-10; Video, at 2:05:45-2:06:00. The Triple III check from dispatch informed Trooper Tripodi about Mr. Mayville's criminal history.
[26] Video, at 2:06:10-2:07.
[27] Tr. at 32:11-15; Video, at 2:06:30-45.

another vacuum sealed package behind the carpeted wall with a scale and one ounce (28 grams) of heroin.[28]

16. After finding the firearms and the suppressor, the troopers placed Mr. Mayville under arrest.[29]

17. Mr. Mayville's blood was drawn at the station. He tested positive for methamphetamine in his bloodstream.[30]

## II. CONCLUSIONS OF LAW

### A. *The Troopers Did Not Unreasonably Prolong the Traffic Stop.*

Mr. Mayville concedes that the initial traffic stop did not violate his Fourth Amendment rights. Instead, he argues that the troopers unconstitutionally prolonged the stop until the NDD arrived. Mr. Mayville contends that but for this unconstitutional extension of the stop, the NDD would not have alerted and the troopers would not have had probable cause to search his vehicle.

The troopers did not unconstitutionally extend the traffic stop. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). In addition to addressing the violation, an officer may also conduct "ordinary inquiries incident to [the traffic] stop." *Id.* at 1615

---

[28] Tr. at 17:22-22:7; 32:16-22; 55:21-57:11; Video, at 2:08:00-26:35.
[29] Tr. at 22:15-24; Video, at 2:26:30-27:15.
[30] Tr. at 47:1-5; 57:13-17; 69:5-8.

(alteration in original) (citation omitted). These incidental inquiries do not unconstitutionally prolong the stop. "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*; *accord* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.3(c) (5th ed. 2016) ("This kind of checking of government records incident to a 'routine traffic stop,' which usually takes a matter of minutes, is well-established as a part of the 'routine,' and has consistently been approved and upheld by both federal and state courts." (footnotes omitted)).

    Here, Trooper Tripodi radioed dispatch to run Mr. Mayville's license and to check for outstanding warrants. While Trooper Tripodi was waiting for the results of the license and warrants check, Trooper Mackleprang circled the perimeter of the car with a NDD, which alerted upon detecting the scent of illicit drugs inside of the vehicle. The dog sniff did not violate Mr. Mayville's privacy rights. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ("[T]he use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,'—during a lawful traffic stop, generally does not implicate legitimate privacy interests." (citation omitted)). And it is well-established that the routine records check did not unconstitutionally extend the traffic stop. Therefore, because the dog sniff occurred while Trooper Tripodi

was still waiting for dispatch to conduct the routine license and warrants check, the troopers did not violate Mr. Mayville's Fourth Amendment rights.

### B. In the Alternative, the Troopers Had Reasonable Suspicion to Continue their Investigation Based on Mr. Mayville's Demeanor.

In the alternative, the troopers possessed reasonable suspicion to prolong the traffic stop in order to determine whether Mr. Mayville was incapacitated or inebriated.

A "driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). In this case, Trooper Tripodi and Trooper Mackleprang noted Mr. Mayville's demeanor, his inability to focus, his difficulty in answering simple questions. As Trooper Tripodi stated, he believed that Mr. Mayville "had some impairment issues."[31] Trooper Mackleprang independently came to the same conclusion.[32]

Based upon the testimony of these two troopers, whom the court found to be credible, the court finds that the troopers had a reasonable articulable suspicion that Mr. Mayville was driving while impaired. Accordingly, the troopers were justified

---

[31] Tr. at 14:22-15:3; 16:18-24.
[32] Tr. at 66:21-68:10.

in continuing their investigation to determine whether Mr. Mayville had been driving in an impaired state. For this independent reason, the troopers did not violate Mr. Mayville's Fourth Amendment rights by continuing to detain him while they investigated further.

### III.  CONCLUSION

For the foregoing reasons, the court DENIES Mr. Mayville's motion to suppress. [Docket 40]

49 days remain on the Speedy Trial clock. The court, therefore, sets the trial in this case for **May 22, 2017 at 8:30 am**.

DATED April 3, 2017

HONORALBE JILL N. PARRISH
United States District Court Judge