IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| UNITED STATES OF AMERICA, | Case No. 2:16-CR-266 JNP |
| --- | --- |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S SECOND MOTION TO SUPPRESS** |
| vs. | |
| JOHN ELISHA MAYVILLE, | District Judge Jill N. Parrish |
| Defendant. | |

After the court denied defendant John Elisha Mayville's first motion to suppress evidence, he filed a second motion to suppress. In his second motion, he argues that the drug and firearm evidence that officers discovered in his car should be suppressed pursuant to the Fourth Amendment, the Utah Government Records Access and Management Act (GRAMA), and the Privileges and Immunities Clause. The court concludes that the search of Mayville's car did not violate any of these constitutional or statutory provisions. The court therefore DENIES his motion to suppress.

## FINDINGS OF FACT

1. On May 6, 2016, Trooper Jason Tripodi stopped a red Audi for going 71 miles-per-hour in a 60 miles-per-hour zone.

2. Trooper Tripodi approached the vehicle, made contact with Mayville, and spoke to him about his speeding. Mayville stated that he was travelling to Grand Junction, Colorado, from Lake Havasu, Arizona.

3. Trooper Tripodi's initial contact with Mayville lasted a couple of minutes. During this initial contact, Trooper Tripodi asked for Mayville's license, registration, and proof of insurance. While Mayville searched for these documents, Trooper Tripodi observed that he "had a lot of trouble coming up with that requested paperwork." Trooper Tripodi noted that the length of time he spent at the passenger side window was due to Mayville searching for the paperwork. Trooper Tripodi observed that Mayville seemed like he "was drowsy, or something was wrong, something was up." Mayville "seemed confused almost" and Trooper Tripodi noticed that Mayville "wasn't able to multitask like a normal individual would be able to." Trooper Tripodi asked Mayville on multiple occasions if he was okay, based on his interaction with him.

4. Trooper Tripodi became concerned that Mayville may have been impaired or drowsy.

5. Trooper Tripodi asked Mayville if he would mind coming back to his vehicle to talk to him while he filled out his paperwork. Mayville declined this invitation.

6. Trooper Tripodi returned to his vehicle and began filling out the paperwork for the stop. He also radioed dispatch in order to run a records check on Mayville. The records check consisted of two main components. First, Trooper Tripodi requested that dispatch run his license and check for warrants. Second, he requested a criminal record check through the Interstate Identification Index, which is commonly called a triple-I check. Trooper Tripodi conducted this check through dispatch because UHP computers only provide limited information.

7. About a minute later, Trooper Tripodi also radioed for a narcotic detector dog and handler.

8. After radioing dispatch for records and for a narcotic detector dog, Trooper Tripodi continued filling out the citation, including "attempting to figure out whose vehicle it was because [Mayville] had no registration paperwork."

9. Approximately four minutes later, prior to dispatch returning any records check information on either Mayville or the vehicle, Trooper Mackleprang arrived with his narcotic detector dog.

10. Once Trooper Mackleprang arrived, Trooper Tripodi briefly informed him about what had occurred. Trooper Mackleprong then asked Mayville to exit the vehicle so that he could run his dog around the car. Mayville refused.

11. Trooper Mackleprang observed that Mayville had delayed reactions, "almost like a blank stare," which caused him to suspect that Mayville was impaired.

12. Trooper Macklprang requested Trooper Tripodi's presence. Mayville exited the vehicle, and Trooper Tripodi patted Mayville down to check for weapons. Trooper Tripodi instructed Mayville to stand on the side of the road a few feet in front of Mayvile's vehicle.

13. The dog sniffed around the vehicle and alerted to the presence of narcotics.

14. Shortly after the dog had alerted to the presence of narcotics in the vehicle, dispatch returned the information about Mayville and his vehicle, indicating that he had a criminal record.

15. Trooper Mackleprang explained to Mayville that his dog had indicated to the odor of narcotics, at which point Mayville stated "there's no way, there's no way." The troopers explained that they were going to search the vehicle and moved Mayville to Trooper Tripodi's vehicle.

16. The troopers conducted a search and found two handguns and a homemade suppressor inside the engine area (one wrapped in a cloth bag, another vacuum sealed with the suppressor); a yellow plastic container with three packages of methamphetamine, totaling approximately one pound (453 grams) behind the carpeted wall of the trunk on the passenger side; and another vacuum sealed package behind the carpeted wall with a scale and one ounce (28 grams) of heroin.

17. After finding the firearms and the suppressor, the troopers placed Mayville under arrest.

18. Mayville's blood was drawn at the station. He tested positive for methamphetamine in his bloodstream.

**ANALYSIS**

Mayville seeks to exclude the evidence discovered in his car under the Fourth Amendment, Utah's GRAMA statute, and the Privileges and Immunities Clause. The court addresses each of these arguments in turn.

### I. THE FOURTH AMENDMENT

The Fourth Amendment to the U.S. Constitution provides that "[t]he right of the people to be secure in their houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. The issue presented in this case is whether Mayville's seizure by state troopers, which led to the discovery of the drug and firearm evidence, was reasonable.

Because Mayville was speeding, Trooper Tripodi's decision to initiate a traffic stop was constitutionally sound. Mayville argues, however, that the troopers violated his Fourth Amendment rights by unreasonably extending the length of the traffic stop, allowing the troopers

time to run a narcotics dog around his car. For two independent reasons, the court determines that the troopers did not unconstitutionally extend the traffic stop.

    *A. The Scope of the Traffic Stop*

First, the court must determine whether the troopers unreasonably extend the length of the traffic stop. In analyzing the reasonableness of the length of detention, courts focus on two factors (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Shareef*, 100 F.3d 1491 (10th Cir. 1996). A court reviews the actions of the police and the reasonableness of the stop under the totality of the circumstances. *United States v. Hunnicutt*, 135 F.3d 1345, 1349-50 (10th Cir. 1998).

Mayville argues that the troopers unconstitutionally prolonged the traffic stop until the drug dog arrived. He contends that but for this unconstitutional extension of the stop, the drug dog would not have alerted and the troopers would not have had probable cause to search his vehicle.

The troopers, however, did not unconstitutionally extend the traffic stop. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). In addition to addressing the violation, an officer may also conduct "ordinary inquiries incident to [the traffic] stop." *Id.* at 1615 (alteration in original) (citation omitted). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*; *accord* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.3(c) (5th ed. 2016) ("This kind of checking of

government records incident to a 'routine traffic stop,' which usually takes a matter of minutes, is well-established as a part of the 'routine,' and has consistently been approved and upheld by both federal and state courts." (footnotes omitted)). These incidental inquiries do not unconstitutionally prolong the stop.

Here, Trooper Tripodi requested that dispatch check for outstanding warrants and perform a triple-I check to see if Mayville had a criminal history. The warrants check is explicitly authorized by the Supreme Court as one of the ordinary inquiries incident to a traffic stop that does not improperly extend the stop. The question here is whether the triple-I check is also an ordinary inquiry incident to the traffic stop.

The Tenth Circuit has not discussed at great length the use of criminal background checks during routine traffic stops. But the cases that do specifically mention background checks include them with other routine electronic records searches incident to traffic stops. In *United States v. Lyons*, for example, the Tenth Circuit held that because an officer had initiated a valid traffic stop, he "could temporarily detain [the motorist], while requesting his driver's license and vehicle registration, running a criminal history check and issuing him a warning ticket." 510 F.3d 1225, 1235 (10th Cir. 2007). And in *United States v. Holt*, an *en banc* panel of the Tenth Circuit held that a "motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history. The justification for detaining a motorist to obtain a criminal history check is, in part, officer safety." 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc). In dicta, *United States v. McRae* further explained the justification for the use of criminal background checks as part of a routine traffic stop:

> Triple I checks are run largely to protect the officer. Considering the tragedy of the many officers who are shot during routine traffic stops each year, the almost simultaneous computer check of a person's criminal record, along with his or her license and registration, is reasonable and hardly intrusive.

81 F.3d 1528, 1535 n.6 (10th Cir. 1996).

Thus, the Tenth Circuit has decided that criminal background checks, such as the triple-I, are part of the routine records checks that are incident to a routine traffic stop. Such records checks do not unconstitutionally extend the scope of the stop.

In this case, moreover, there is no indication that the triple-I check extended the stop. Trooper Tripodi testified that he radioed dispatch to request both a warrants check and a criminal background check. Nothing in the evidence presented to the court suggested that the triple-I portion of the records check delayed dispatch's response to Trooper Tripodi's inquiry. Thus, there is no indication that the criminal background check actually caused any extension of the traffic stop.

In sum, the court finds that Officer Tripodi did not unconstitutionally extend the traffic stop by conducting a records check pursuant to the valid stop of Mayville's car. Because the drug sniff and indication by the drug dog occurred during this period of time, the subsequent search and discovery of evidence in the car did not violate Mayville's Fourth Amendment rights.[1] *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ("[T]he use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from

---

[1] After the drug dog indicated, Trooper Mackleprang signaled to Trooper Tripodi. Soon thereafter, dispatch contacted Trooper Tripodi and notified him that the records check was complete. Trooper Tripodi quickly confirmed that Trooper Mackleprang was signaling that the dog had indicated before responding to the radio transmission from dispatch. Mayville suggests that the delay of a few seconds in Officer Tripodi's response to dispatch constituted an unconstitutional extension of the stop. But once the dog indicated, Trooper Mackleprang had sufficient probable cause to further detain Mayville and search his car. The time that it took to communicate this development to Trooper Tripodi did not unconstitutionally extend the traffic stop.

public view,'—during a lawful traffic stop, generally does not implicate legitimate privacy interests." (citation omitted)).

   B. *Reasonable Suspicion to Investigate Mayville's Potential Impairment*

In the alternative, the troopers possessed reasonable suspicion to prolong the traffic stop in order to determine whether Mayville was incapacitated or inebriated. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) ("A driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning."). In this case, Trooper Tripodi and Trooper Mackleprang noted Mayville's demeanor, his inability to focus, his difficulty in answering simple questions, as well as the lack of paperwork for the vehicle. As Trooper Tripodi stated, he believed that Mayville "had some impairment issues." The troopers were therefore justified in continuing their investigation to determine whether Mayville was driving under an impaired state. Indeed the trooper's suspicions were later confirmed when a subsequent blood draw tested positive for methamphetamine.

Mayville argues that the court should disbelieve the trooper's testimony regarding indications of impairment because the evidence shows that that Trooper Tripodi and Trooper Mackleprang were stopping cars that night with the purpose of looking for drugs. Mayville argues that because the troopers had this purpose in mind, they only manufactured their observations of impairment in order justify a search of the vehicle.

The court rejects this argument. The court had the opportunity to assess Trooper Tripodi and Trooper Mackleprang's demeanor when they testified and finds that they were credible.

Additionally, their testimony is corroborated by a subsequent test that showed that Mayville did in fact have methamphetamine in his system.

Mayville also suggests that because the troopers did not begin their investigation of his impairment before the drug dog indicated, the trooper's suspicions either could not extend the stop or should be disbelieved. But the troopers could properly complete the records check pursuant to the traffic stop before investigating their suspicions about Mayville's impairment. Indeed, Trooper Tripodi testified that he backed up his police car, likely because he wanted to give himself room to conduct a field sobriety test.

Thus, even if the troopers had slightly prolonged the traffic stop, they did so based on their reasonable concern that Mayville was driving while impaired. Because the troopers had reasonable suspicions that permitted them to further detain Mayville, the drug dog indication and subsequent search of his car did not violate his Fourth Amendment rights.

## II. GRAMA

Next, Mayville argues that the evidence should be suppressed because the state of Utah violated its GRAMA statute when it provided his criminal records pursuant to the triple-I request made by Trooper Tripodi. The court rejects this argument for two reasons.

First, state officials did not violate the GRAMA statute by providing criminal records pursuant to Trooper Tripodi's request. The GRAMA statute restricts Utah agencies from revealing to the public certain protected records. Mayville points to Utah Code section 63G-2-305(31), which defines protected records to include "records provided by the United States or by a government entity outside the state that are given to the governmental entity with a requirement that they be managed as protected records if the providing entity certifies that the

record would not be subject to public disclosure if retained by it." Mayville argues that because a triple-I check is provided by the FBI, it is a protected document under this provision.

Mayville has not made a showing that the FBI requires triple-I checks to be managed as protected documents. But the court need not address Mayville's argument that the triple-I became a protected document when the FBI provided it to Trooper Tripodi or decide whether any Utah agency unlawfully disclosed a protected document in this case. Utah Code section 63G-2-206 lists several circumstances under which a Utah agency may disclose a protected document. This statute provides: "Records that may evidence or relate to a violation of law may be disclosed to a government prosecutor, peace officer, or auditor." UTAH CODE § 63G-2-206(9). Mayville's Utah criminal records by definition "relate to a violation of law," and Trooper Tripodi is a peace officer. Therefore, even if the triple-I background check was a protected document, no Utah agency violated GRAMA by providing Mayville's criminal record to the FBI or to Trooper Tripodi.

Second, even if Mayville could show that the GRAMA statute had somehow been violated, the remedy is not the exclusion of evidence. The GRAMA statute provides criminal penalties for a public employee who intentionally discloses a protected document. UTAH CODE § 63G-2-801. A party can also obtain an injunction to prevent disclosure. UTAH CODE § 63G-2-802. But GRAMA does not include as a remedy the exclusion of evidence in a criminal proceeding. Because GRAMA enumerates the remedies available for a violation, there is no cause for this court to announce an exclusionary rule as a judicially-created remedy.

For these reasons, Utah's GRAMA statute is not a basis for excluding the drug and firearm evidence discovered in Mayville's car.

### III. The Privileges and Immunities Clause

Finally, Mayville argues that the court should exclude the evidence against him pursuant to the Privileges and Immunities Clause of the Constitution, which provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." This clause protects an individual's right to travel among the various states. This right to travel encompasses three different components:

> It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Saenz v. Roe*, 526 U.S. 489, 500 (1999).

Mayville produced evidence that during the period of time that Trooper Tripodi was patrolling I-70, he mostly stopped cars with out-of-state license plates. From this evidence, Mayville argues that Trooper Tripodi engaged in a pattern of pulling over cars registered in other states. He asserts that this practice of selectively enforcing traffic law violations committed by the citizens of other states deprived those travelers of the privileges and immunities enjoyed by Utah citizens.

The government contests the inference of selective enforcement drawn by Mayville, arguing that many out-of-state vehicles pass through the stretch of highway Trooper Tripodi was patrolling. The court, however, need not address the factual question of whether Trooper engaged in a pattern of pulling over out-of-state vehicles. Even if he had done so, such a pattern would not violate the Privileges and Immunities Clause.

In *State v. Chettero*, the Utah Supreme Court addressed the same argument made by Mayville. At least 95% of the vehicles pulled over by the trooper in that case bore out-of-state

plates. *State v. Chettero*, 297 P.3d 582, 584 (Utah 2013). The trooper's decision to stop so many cars from other states was based on information that individuals were transporting a high volume of marijuana recently harvested in California. The defendant claimed that the trooper who pulled him over violated the second component of the right to travel—the right to be treated as a welcome visitor—by engaging in a practice of selectively enforcing traffic laws. *Id.* at 585–86. Noting that the cases that deal with this right indicate that it implicates "only the rights of non-residents to exercise fundamental economic rights . . . or to seek important services," the Utah Supreme Court concluded that the right to be treated as a welcome visitor did not apply to the selective enforcement of traffic laws based upon out-of-state license plates. *Id.* at 586 (citing *Saenz*, 526 U.S. at 501–02). This court agrees that the second component of the right to travel has no application here.

The first component of the right to travel—the right to enter and leave another state—is likewise inapplicable. The Supreme Court has held that this right is violated when a state erects actual barriers to entry. *See Edwards v. California*, 314 U.S. 160, 174 (1941) (finding a statute to be unconstitutional where its "express purpose and inevitable effect [was] to prohibit the transportation of indigent persons across the California border"). Being legally stopped for a traffic violation while travelling through a foreign state does not constitute such "an 'actual barrier' to interstate travel." *Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 568 (D. Md. 1999) (holding that a traffic stop did not violate the first component of the right to travel).

Mayville does not cite any cases that support the proposition that the Privileges and Immunities Clause prohibits police officers from selectively enforcing traffic violations committed by out-of-state travelers. The only authority he cites, *Saenz*, 526 U.S. 489, 502–04,

addresses restrictions on state benefits provided to new residents. It does not speak to traffic stops of citizens of other states. Absent any authority for the proposition that selective traffic stops violate the right to travel embraced by the Privileges and Immunities Clause, and with persuasive authority to the contrary, the court concludes that Trooper Tripodi did not violate this clause of the Constitution.

Finally, even if Mayville could make out a claim, he has not provided any authority or argument for the proposition that the exclusionary rule applied to violations of the Fourth Amendment also applies to violations of the Privileges and Immunities Clause. Mayville cites *Mapp v. Ohio*, but that case specifically holds that the exclusionary rule must be applied to violations of the Fourth Amendment, not to any violation of any provision of the Constitution. 367 U.S. 643, 655 (1961). Absent any authority for extending the exclusionary rule to violations of the Privileges and Immunities Clause, the court declines to do so here. *See United States v. Burnett*, No. 4:06CR00271-01 SWW, 2007 WL 2711021, at *2 (E.D. Ark. Sept. 13, 2007) ("[E]ven if [an officer] violated [a motorist's] right to travel [by targeting out-of-state motorists], suppression of evidence pursuant to the exclusionary rule is a remedy for violations of the Fourth Amendment, and the Court declines to extend the rule as a remedy for other constitutional violations.").

The court, therefore, rejects Mayville's argument that the Privileges and Immunities Clause requires the suppression of the evidence recovered from his car.

## CONCLUSION

For the foregoing reasons, the court DENIES Mayville's motion to suppress.

DATED March 7, 2018

HONORALBE JILL N. PARRISH
United States District Court Judge